UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                          CRIMINAL NO. 3:22-CR-13-DPJ-LGI

JONATHAN BAREFOOT, ET AL.

ORDER

Defendants Adam "Casey" Earnest, Christopher Randell, and James "Gabe" Klish were
convicted for conspiring to commit tax fraud and aiding or assisting in tax fraud.  They now seek
judgment of acquittal or, alternatively, a new trial.  *See* Earnest Mot. [238], Klish Mot. [239],
Randell Mot. [240].  Because the evidence of their guilt was overwhelming, judgment of
acquittal is denied.  And because there was no error, much less prejudicial error, they are not
entitled to a new trial.

I.        Background

Defendants were income-tax-return preparers at Sunbelt Tax Services in Jackson,
Mississippi, a company Earnest owned and managed.  The Government contended that Earnest
and his employees—including Randell and Klish—prepared fraudulent tax returns to generate
higher refunds for their clients and thus more business for themselves.  The three primary means
for increasing refunds were (1) claiming education credits for taxpayers who were not in school;
(2) inflating deductions on Schedule As; and (3) manipulating income and expenses on Schedule
Cs.

This pattern apparently began at American Tax Services, where Earnest and Randell
worked before Sunbelt.  It also drew the IRS's attention.  In 2012 and 2014, the IRS conducted
two due-diligence audits at American Tax to address issues that included questionable education
credits, Schedule As, and Schedule Cs.  The audits were designed to ensure that the tax preparers

were properly documenting their files and had satisfied the due-diligence requirements before including these deductions and credits on their clients' returns.  Earnest and Randell received six-figure fines.

After the audits, Earnest left American Tax and, in January 2015, opened Sunbelt where he hired Randell, Klish, and other tax preparers.  Though they were working under a different name, the Government says Earnest and his employees followed the same pattern of falsely claiming education credits and manipulating Schedule As and Schedule Cs.  Eventually, the IRS raided Sunbelt, and the Government obtained an indictment against Earnest, Randell, Klish, and other Sunbelt employees Jonathan Barefoot, Dwight Stamey, and John Wells.  The latter three pleaded guilty before trial

Count 1 charges Earnest, Randell, and Klish with violating 18 U.S.C. § 371, which makes it a crime to conspire to defraud the United States.  The remaining counts charge Defendants with violating 26 U.S.C. § 7206(2), which makes it a crime to willfully aid or assist in preparing or filing a materially false tax return.  The § 7206(2) counts relate to specific tax returns prepared for Sunbelt customers.  The Government dropped two of those counts against Randell (Counts 9 and 10) because the taxpayer witnesses never testified.  The Court later granted judgment of acquittal for all § 7206(2) counts against Klish (Counts 11 through 13) because the evidence could not link Klish to those returns.

The remaining counts were sent to the jury and resulted in convictions.  Specifically, the jury found Earnest, Randell, and Klish guilty of conspiracy under § 371 as charged in Count 1.  It also found that Earnest violated § 7206(2) as to the returns charged in Counts 5 through 7 and that Randell violated § 7206(2) as to the return charged in Count 8.  Defendants now seek judgment of acquittal or a new trial, and the briefing has closed.

II.     Standards

The factual analysis for the motions for judgment of acquittal overlaps with the analysis for the motions for a new trial.  For example, Defendants say the evidence was insufficient under Rule 29 but also argue that the verdict was against the greater weight of the evidence under Rule 33.  For that reason, the Court will provide the standards for both rules and then examine the sufficiency-of-the-evidence arguments together.  The final section of this Order addresses Defendants' arguments for a new trial based on trial error.

A.     Rule 29

Under Rule 29, the Court may set aside a jury's verdict of guilt if "the evidence is insufficient to sustain a conviction" of one or more of the offenses charged in the indictment. Fed. R. Crim. P. 29(a), (c).  "The jury's verdict will be affirmed 'if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt.'"  *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011) (quoting *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997)).  "In assessing the sufficiency of the evidence, we do not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict."  *Id.* (citing *Myers*, 104 F.3d at 78–79).

B.     Rule 33(a)

Rule 33(a) allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  But "[t]he grant of a new trial is necessarily an extreme measure." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).  Therefore, "motions for new trial are not favored, and are granted only with great caution."  *Id.* (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)).  "A new trial is granted only upon demonstration of

adverse effects on substantial rights of a defendant." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *O'Keefe*, 128 F.3d at 898). An error affects the defendant's substantial rights if "it affected the outcome of the trial court proceedings." *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001).

When considering a motion for a new trial, the Court "may weigh the evidence and assess the credibility of the witnesses." *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005) (citing *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* (quoting *Robertson*, 110 F.3d at 1118). And "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright, et al., Federal Practice and Procedure Criminal § 556 (3d ed. 2004)).

III.    Analysis

A.      Motion for Judgment of Acquittal or New Trial Based on Sufficiency of Evidence

Defendants seek judgment of acquittal as to the convictions in Count 1 under § 371 and the individual counts under § 7206(2). As noted, the Court will consider the evidence under Rules 29 and 33.

1.      Convictions under 18 U.S.C. § 371

Count 1 charges Defendants with violating § 371, which makes it a crime for two or more persons to conspire to commit an offense against the laws of the United States. In the tax-fraud context, the elements are:

First:   That the defendant and at least one other person made an agreement to defraud the government or one of its agencies by impairing, obstructing, or defeating the lawful function of the Internal Revenue Service in the ascertainment, assessment, or collection of income taxes due, as charged in the indictment; and

4

Second: That the defendant knew that the purpose of the agreement was to defraud the government and joined in it willfully, that is, with the intent to defraud; and

Third:  That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment in order to accomplish some object or purpose of the conspiracy.

C-9 (Jury Instructions) at 16 (based on Fifth Circuit Pattern Jury Instruction (Crim.) 2.15B); *see United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013).  While Defendants generically say they are entitled to judgment of acquittal on Count 1, their specific arguments focus on the existence of an agreement and whether the Government proved that they knowingly joined in it.

a.      An Agreement

Defendants' arguments on the agreement element are narrow.  They attack two Government witnesses, former Sunbelt employees John Wells (who pleaded guilty before trial) and Jessica Cella (who was never charged), claiming that neither could "*credibly* establish any agreement to defraud the government."  Earnest Mot. [238] at 5 (emphasis added); *see also* Randell Mot. [240] at 3.

There are four threshold problems with this argument.  First, both witnesses testified to facts showing an agreement at Sunbelt to falsify education credits, Schedule As, and Schedule Cs.  Whether the testimony "credibly" establishes an agreement is no concern under Rule 29. *See Girod*, 646 F.3d at 313.

Second, Defendants' argument suggests that neither Wells nor Cella could prove that a formal agreement existed, though no such proof is required.  "The existence of an agreement, as well as a defendant's knowledge of its objective and intent to join, can be established by circumstantial evidence alone."  *United States v. Green*, 47 F.4th 279, 291 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 747, 214 L. Ed. 2d 450 (2023), and *cert. denied sub nom. Selgas v. United*

5

*States*, 143 S. Ct. 1058, 215 L. Ed. 2d 281 (2023).  "For the evidence to sustain the conviction, it is not necessary that the evidence show an express or formal agreement; evidence of 'a tacit understanding is sufficient.'"  *Id.* (quoting *United States v. Aubin*, 87 F.3d 141, 145 (5th Cir. 1996)).  But "[t]he actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt."  *Id.* (quoting *United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018)).

Third, even if Wells had been the only witness, "'[a] defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible,' that is, unless 'it relates to facts that the witness could not possibly have observed.'"  *United States v. Martinez-Brilia*, No. 21-20386, 2022 WL 6316523, at *5 (5th Cir. Oct. 10, 2022) (quoting *United States v. Booker*, 334 F.3d 406, 410 (5th Cir. 2003)), *cert. denied sub nom. Marquez-Oseguera v. United States*, 143 S. Ct. 1038, 215 L. Ed. 2d 198 (2023).  No one disputes that Wells worked at Sunbelt where he could have observed the fraud.

Fourth, by focusing their argument on Wells and Cella, Defendants ignore the Government's 20 other witnesses and the massive record received into evidence.  Viewing the entire record easily establishes the agreement element under Rules 29 and 33:

- Wells testified that Earnest trained him at American Tax to claim false education credits and falsify Schedule As and Schedule Cs.

- Wells and Cella both said Earnest and Randell knew Sunbelt employees were filing false education credits, Schedule As, and Schedule Cs.  Wells said they told him how to do it, and Cella added that sometimes she would start a return and Earnest would finish it.  She noticed times when she recorded that the client had not been to school that year but, when the return was filed, the education credit had been added.

- Wells testified that Earnest and Randell told him how to avoid detection by the IRS.  For example, he was instructed that when making up numbers to plug into the schedules, he should not use round numbers because the IRS would flag them as suspicious.  That

testimony was corroborated by a hand-written note found in a Sunbelt manual that Wells
said was in Earnest's handwriting:



G-539 at 27.

- Wells said Earnest covered up the fraud by having taxpayers sign blank questionnaires so
  Sunbelt could later document its due diligence.  Cella confirmed the use of blank forms,
  and signed, blank forms were found throughout the client files when the IRS raided
  Sunbelt.

- Wells and Cella also explained that Earnest regularly prepared returns while using his
  employees' Tax Preparer Identification Numbers (TPINs).

- Wells testified that he was told how to determine the numbers he made up.  For example,
  he says he was instructed to claim 10% of the income under Schedule A, how much to
  claim for education expenses (even if no expenses were incurred), and how much income
  would be needed to maximize the earned-income tax credit.  Cella and various tax returns
  corroborate all three means.  *See, e.g.*, G-170.

- Along these lines, Wells identified a hand-written bell curve showing the false income he
  should use to maximize earned-income tax credits.  *See* G-535.  Cella confirmed that it
  was used.

7

- Wells's testimony that he would create numbers to increase refunds and that Earnest helped him do it is documented on an undercover video taken by an IRS agent posing as a new customer.  On the recording, Wells tells the agent, "We got to get your income up."  G-560.  Though the undercover agent said there were no side jobs, Wells falsely added self-employment income of $6,179 for janitorial services.  *See* G-50 at 1, 12.  He used that description of the work because he was taught to use fake employment similar to the taxpayer's occupation.  Earnest is seen on the video checking the return Wells was preparing.  *See* G-560.  Wells never informed the undercover agent that these fake numbers would be used.  He also got her to sign a blank self-employment questionnaire, further corroborating his testimony on the use of blank questionnaires to falsely document the files.

- Wells also testified that the tax preparers were incentivized to include false education credits, Schedule As, and Schedule Cs.  According to him, the clients would pay additional fees when the returns included those deductions and credits.  So, the more of those devices the preparers used, the higher the cost to the customer.  The preparer would then receive 25% of those fees.  Of course, the customers rarely paid anything themselves because they regularly received refunds from which the fees were deducted.

- Ten Sunbelt clients confirmed these practices.  For example, taxpayer Harper neither worked nor paid taxes in 2015 yet received a $6,763 refund due to fraudulent deductions and credits.  *See* G-11 at 3.

- Taxpayer Gatlin testified that Randell pulled numbers "out of the blue" when helping her obtain a refund in tax year 2015.  *See* G-3.

- Taxpayer Johnson testified that Schedule C on her 2012 return [G-60] included business losses of over $7,000 and expenses exceeding $8,000 that she never incurred and never provided to Sunbelt.  Her Schedule A had $3,965 in charitable gifts she never made.  Her return also falsely claimed that she attended JSU in 2012 though she graduated thirty years earlier in 1982.  Johnson testified that she never provided this information to Earnest, who prepared this return.  And her returns in subsequent years had the same pattern of false statements on the same forms.  *See* G-61–G-64.

- Taxpayer Rutledge identified Randell as the one who prepared his 2014 return.  Rutledge worked that year for General Recycling, and his return [G-519] falsely listed thousands in gifts and fake business expenses that he never incurred and never provided to Sunbelt.  It also listed him as attending Hinds Community College though he never did—something he and a witness from the school confirmed.

- Taxpayer Stamps brought a list of her legitimate deductions with her to Sunbelt.  *See* G-525 at 8.  Those records were in the client file confiscated when the IRS later raided Sunbelt.  Despite having documentation of her actual numbers, her return increased those numbers following the same pattern of fraud as the other returns.  *See* G-135.

- The other taxpayer clients gave similar testimony, but the pattern extended far beyond the taxpayers who testified. IRS Agent Samuel Thomas testified that he mined the IRS database for Sunbelt returns between 2014 through 2022 that claimed education credits but for which there were no corresponding 1098Ts. He found 4,509 examples. *See* G-605. Representatives from two local schools confirmed that those forms were required for all students claiming credit.

There's more evidence in the record, some of which the Government lists in its response. But these facts overcome the challenges under Rules 29 and 33 as to the existence of an agreement.

> b.    Defendants' Willful Participation in the Agreement

The second element of the conspiracy count requires proof, beyond a reasonable doubt, that the defendant knew that the purpose of the agreement was to defraud the government and joined in it willfully, that is, with the intent to defraud. *Njoku*, 737 F.3d at 64. To begin, Defendants suggested at trial that tax laws are nuanced and mistakes happen. But there is nothing nuanced about requiring real numbers on tax returns. Nor is it hard to understand that education credits are reserved for those with education expenses. Aside from that, the Government offered proof that each Defendant willfully participated in the scheme.

**Defendant Earnest:** The evidence that Earnest willfully joined the agreement starts with his knowledge that Sunbelt's practices were fraudulent. As noted, the IRS conducted two due-diligence audits in 2012 and 2014 while Earnest worked at American Tax. IRS agents John Thomas and Robert Dunaway testified that the audits were designed to ensure that the tax preparers were properly documenting their files and had satisfied due-diligence requirements before claiming credits or deductions. The audits specifically addressed the same education credits, Schedule As, and Schedule Cs charged in the indictment, and both Earnest and Randell were fined hundreds of thousands of dollars. The testimony suggested that Earnest understood what was required to properly seek those deductions and credits.

When he opened Sunbelt after the second audit, issues with education credits, Schedule As, and Schedule Cs continued. Much of this overlaps the previous section, but Wells and Cella testified that Earnest prepared false returns, and Wells said Earnest taught him how to do it. Cella said she confronted Earnest and was told not to worry. Earnest is seen on video checking Wells's numbers on a fraudulent return prepared for the undercover IRS agent. Wells testified that Earnest wrote the instructions advising his employees not to use round numbers when making up entries. *See* G-539. His clients, Johnson and Stamps, testified that Earnest completed tax returns for them that included fictitious numbers. Their testimony also corroborated other evidence that he used his employees' PTINs—which is itself fraudulent. And he instructed employees to have clients sign blank questionnaires to falsely document the false numbers.

Earnest is also listed as the tax preparer on Klish's personal return for tax year 2015. *See* G-222. That return claims that Klish was a student at Jackson State University in 2015, though he was working for Earnest that year at Sunbelt. Jackson State employee Tysha Sutton testified that Klish was never a Jackson State student, and there was no 1098T to support the claimed credit. The Government met its burden of showing Earnest's willful participation in the agreement.

**Defendant Randell:** The evidence of Randell's willful participation in the conspiracy is just as strong. Along with the evidence about the two IRS audits, Wells described Randell as being second in command at Sunbelt and involved in the agreement to defraud. Both Wells and Cella said Randell knew Sunbelt was filing fraudulent returns because they discussed it with him or in his presence. Wells further said Randell would help him prepare false returns.

Aside from his management functions, Randell prepared false returns. Taxpayer Gatlin identified Randell as the one who prepared her false Schedule C. And Randell used these same

10

tactics on his own tax returns.  Randell claimed education credits in 2013, 2014, and 2015 for

being a student at Jackson State and for his studies at Hinds Community College.  *See* G-211–13;

G-601.  Witnesses from both schools testified that he never attended either.  Notably, those

schools were included in a list of local schools found during the IRS raid at Sunbelt.  *See* G-533.

According to Wells, Randell generated that list for use by Sunbelt employees when claiming

false education credits.

 Randell's intent to inflate refunds can also be seen in the percentage of clients who

received refunds.  The Preparer Information Report for Randell shows the following under

"Percentage with refunds":

| 2014 | 100% |
|------|------|
| 2015 | 100% |
| 2016 | 100% |
| 2017 | 99% |
| 2018 | 98% |
| 2019 | 94% |
| 2020 | 96% |

*See* G-306.  For tax preparation year 2021, which was after he was aware of the investigation and

the year before he was indicted, that number dropped to 44%.[1]  *Id.*  As with Earnest, the

Government met its burden.

 **Defendant Klish:**  Klish argues that he was found guilty by association.  He also notes

that, unlike Earnest and Randell, he was not subject to the IRS audits and "there was no evidence

presented at trial that [he] had ever been placed on notice."  Klish Mot. [239] at 2.  Starting there,

it should not take an IRS audit to put someone on notice that you can't lie on tax returns.  And in

any event, other evidence shows that Klish willfully joined the conspiracy.  For example:

---

[1] The Court does not recall any discussion about the "Percentage with refunds" numbers, though
the documents were received in evidence.  If the Court has misconstrued the evidence, it would
in no way alter the results given the breadth of the Government's case.

- Wells testified that he and Klish agreed to prepare false returns at Sunbelt.  He also said he helped Klish do it.

- Wells said he saw Klish use the list of local schools that Randell circulated for use when making false claims for education credits and that he witnessed Klish preparing false returns, including returns with false Schedule A deductions.

- Klish allowed Earnest to use his PTIN, as shown by Wells's testimony and taxpayer Johnson's 2015 return.  *See* G-63 at 4.  Wells said Sunbelt employees were paid a percentage of the preparer's fees when Earnest used their numbers.

- Maybe the strongest evidence of Klish's willfulness came from his own 2015 tax return [G-222], which tracked the same false accounting, including the false claim that he attended Jackson State University.  Jackson State employee Sutton testified that Klish never attended that school.  Earnest was listed as the tax preparer on that false return.  So, if Klish reviewed his return when he signed it (as the form attests) then he knew what Earnest was doing and joined in it.

- Like Randell, Klish's Preparer Information Report indicates the extent to which his clients obtained refunds.  Even if Earnest prepared some of these under Klish's PTIN, Wells said Klish was working at Sunbelt and preparing returns, and nearly every return with his number received a refund until the indictment.  In 2016, every client received one.  G-307.  That percentage stayed no lower than 96% through 2020, before dropping slightly to 93% in 2021.  *Id.*  Klish's "Percentage with refund" numbers eventually plummeted in tax-preparation year 2022, the year he was indicted.  *Id.*

Though the evidence did not suggest that Klish played a leadership role like Earnest and Randell, it does support the verdict that he joined the agreement willfully.

c.     A Conspirator Committed an Overt Act

Defendants never directly challenge the overt-act element, and it is easily met.  One of the overt acts listed in the indictment is Earnest's use of others' PTINs.  The overt acts also include the charges under § 7206(2), and, as discussed next, those charges also survive the challenges under Rules 29 and 33.

In sum, the motions under Rules 29 and 33 are denied as to Count 1.

12

### 2.   Convictions under 18 U.S.C. § 7206(2)

Section 7206(2) makes it unlawful to aid or help prepare fraudulent tax returns.  To

establish guilt, the Government must prove the following beyond a reasonable doubt:

> (1) each defendant aided, assisted, counseled, or advised another in the
> preparation of the tax return in question; (2) the tax return contained a statement
> falsely claiming income, deductions, or tax credits; (3) the defendant knew that
> the statement was false; (4) the false statement was material; and (5) the
> defendant acted willfully.

*United States v. Morrison*, 833 F.3d 491, 500 (5th Cir. 2016) (citing 26 U.S.C. § 7206(2); *United*

*States v. Clark*, 577 F.3d 273, 285 (5th Cir. 2009)).

The jury convicted Earnest and Randell on four counts of violating § 7206(2).  Each

count related to a specific tax return the Defendant allegedly helped prepare and identified the

taxpayer and tax year.  As a broad observation, the evidence clearly establishes that those returns

contained false information.  Neither Defendant argues otherwise.  The evidence is also

overwhelming that both Defendants willfully joined in the broader conspiracy to defraud the

government; that is, they knew what they were doing.  But Earnest says the Government failed to

prove he prepared the returns cited in Counts 6 and 7.  And Randell challenges the strength of

the Government's evidence related to Count 8.

### a.   Count 6 against Earnest

Count 6 addresses taxpayer Johnson's false 2016 tax return.  Although the return lists

Wells as the tax preparer, Johnson identified Earnest in Court as the one who prepared it.

Earnest now says that is insufficient to sustain the verdict because "Wells was shown the return

at issue [in Count 6], G-64, and testified on cross examination that he prepared it."  Earnest Mot.

[238] at 4.  That's close but not quite true.  On cross, counsel showed Wells his PTIN on G-64

and asked, "That's because you prepared this return, didn't you?"  He responded, "Yes, *I believe*

*so*." Wells Tr. (attached as Exhibit A) at 119 (emphasis added). Again, the Court may not weigh the evidence under Rule 29. And even under Rule 33, the jury was free to believe Johnson's clear testimony that Earnest was her tax preparer over Wells's equivocation—especially given the evidence that Earnest often used Wells's PTIN.[2]

   b. Count 7 against Earnest

  Count 7 relates to taxpayer Stamps's false return for tax year 2016. Earnest disputes that conviction because the return identifies Dwight Stamey as the tax preparer. *See* G-135. But Stamey's number on the return means little given the substantial evidence that Earnest regularly used his employees' PTINs to hide his fraud. In addition, Stamps twice denied knowing Stamey and testified that Jonathan Barefoot and Earnest prepared her returns. According to Stamps, she used Sunbelt three times—Barefoot prepared her tax returns twice and Earnest prepared them once. Consistent with that testimony, Barefoot's number appears on the returns for tax years 2014 and 2015. *See* G-133, G-134. That leaves 2016—the year charged in Count 7—as the only other tax year Stamps used Sunbelt. So, if she used Earnest once, the jury could find that it was for 2016. Count 7 stands.

   c. Count 8 against Randell

  Count 8 claims that taxpayer Gatlin's 2015 return [G-3] included a false Schedule C that Randell prepared. Randell offers no specific arguments about this count, and there is no evidence disputing his identity as the preparer. He did seek judgment of acquittal at trial because the Government could not determine the correct income Gatlin should have reported. If Randell

---

[2] The return addressed in Count 5 may have a similar issue because it lists Klish as the preparer even though Johnson identified Earnest. *See* G-63 at 4. Earnest makes no evidence-based arguments specific to Count 5, but his use of others' numbers and Johnson's testimony would preclude relief anyway.

is reasserting that position, he fails to address the fact that the numbers Randell used on the return did not match any of the potential incomes addressed during Gatlin's testimony; indeed, Gatlin testified that Randell made the numbers up.  In other words, even if her income remains unknown, the Government still proved that the numbers Randell used were fictious.

B.      Motion for Judgment of Acquittal as to Counts 5 and 7 for Constructive Amendment

As he did at trial, Earnest says "the government's proof as to [Counts 5 and 7] amounted to a constructive amendment of the indictment."  Earnest Mot. [238] at 4.  The Government says the indictment was sufficient and that at most a non-prejudicial variance occurred.  The Court again finds that the counts should not be dismissed.

"An indictment is legally sufficient if (1) 'each count contains the essential elements of the offense charged,' (2) 'the elements are described with particularity,' and (3) 'the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense.'" *United States v. Fairley*, 880 F.3d 198, 206 (5th Cir. 2018) (quoting *United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013)).  "The validity of an indictment is determined from reading the indictment as a whole, and . . . must be determined by practical, not technical, considerations . . . ."  *United States v. Markham*, 537 F.2d 187, 192 (5th Cir. 1976) (citation omitted).  Thus,

> [i]ndictments are read for their clear meaning and convictions will not be reversed because of minor deficiencies which do not prejudice the accused.  Whether or not the defendant has been prejudiced is a controlling test of the validity of an indictment. . . .  The test of sufficiency is not whether the indictment could have been more artfully or precisely drawn, but whether it states the elements of the offense intended to be charged and adequately apprises the defendant of that which he must be prepared to meet.

*United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979) (citations omitted).

A constructive amendment occurs when [the court] permits the defendant to be convicted upon a factual "basis that effectively modifies an essential element of

> the offense charged or permits the government to convict the defendant on a
> materially different theory or set of facts than that with which [he] was charged."

*United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010) (quoting *United States v. Hoover*, 467 F.3d 496, 500–01 (5th Cir. 2006)).  Or, said differently, it occurs "when the government is allowed to prove 'an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment.'"  *United States v. Robles-Vertiz*, 155 F.3d 725, 728 (5th Cir. 1998) (quoting *United States v. Salvatore*, 110 F.3d 1131, 1145 (5th Cir. 1997), *abrogated on other grounds by Cleveland v. United States*, 531 U.S. 12, 23 (2000)).

Variances happen "when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense."  *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005).  Courts "determine whether a variance occurred by comparing the evidence presented at trial with the language of the indictment."  *Girod*, 646 F.3d at 316 (citing *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).  When a variance occurs, the Fifth Circuit reverses "only if the variance prejudiced the defendant's substantial rights."  *Id.* (citing *Delgado*, 401 F.3d at 295; *Medina*, 161 F.3d at 872).  For that, the Court "employ[s] a harmless-error analysis."  *Id.* (citing *United States v. Ramirez*, 145 F.3d 345, 351 (5th Cir. 1998); *United States v. Dean*, 59 F.3d 1479, 1491 (5th Cir. 1995)).

The dispute here centers on the type of false statements alleged in Counts 5 and 7.  The introductory paragraph to those counts states that Earnest knowingly helped his clients claim fraudulent "deductions," with no mention of fraudulent credits.  But the specific counts state that the returns falsely Claimed Schedule A deductions and "Education *Credit*[*s*]."  Indictment [3] at 5 (emphasis added).  The full text states:

16

19.     On or about the dates specified in the Counts below, in Hinds County in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant **ADAM EARNEST**, aided and abetted by others known and unknown to the Grand Jury, did willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the Internal Revenue Service of the U.S., Individual Income Tax Returns, Forms 1040, either individual or joint, for the taxpayers and calendar years hereinafter specified. The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue laws to claim deductions for items and in amounts hereinafter specified, whereas, as the defendant **ADAM EARNEST** there and then knew, the taxpayers were not entitled to claim deductions in the claimed amounts.:

| COUNT | DATE | TAXPAYER | CALENDAR TAX YEAR | FALSELY CLAIMED ITEM |
|---|---|---|---|---|
| 5 | February 4, 2016 | "M.J." | 2015 | Education Credit; Schedule A |
| 6 | January 25, 2017 | "M.J." | 2016 | Schedule A |
| 7 | February 17, 2017 | "W.S." | 2016 | Education Credit; Schedule A |

*Id.* Consistent with the table—but not the introductory paragraph—the evidence at trial included proof of false education credits.

It would have been clearer to state in the introductory paragraph that the returns were false because of deductions *and* credits. But the column for "FALSELY CLAIMED ITEM[S]" references both Schedule A deductions and "Education Credit[s]." *Id.*; *see United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013) (finding indictment sufficient because captions removed any ambiguity). Thus, the indictment—when read as a whole—gave Earnest notice that he was being charged with helping prepare returns that falsely claimed deductions and education credits. And the indictment otherwise contained the essential elements, described them with particularity, and protected Earnest from double jeopardy. The indictment was sufficient.

17

Because the indictment charges Earnest with preparing returns that included false education credits, there was no constructive amendment. Nor was there a variance. But assuming a variance could be inferred, there was no prejudice because Earnest understood the charges and tried his case accordingly. For example, he highlighted the education-credits issue in his opening statement. Finally, the Court reduced the risk of prejudicial jury confusion by granting Earnest's request for an unanimity instruction specific to Counts 5 and 7. The motion is denied as to Counts 5 and 7.[3]

C.      Motion for New Trial Based on Suggested Error

Defendants say the Court erred in two ways. First, they claim the Court should have precluded other-acts evidence under Federal Rule of Evidence 404(b). Second, they dispute a summary chart offered through IRS Investigative Analyst Sam Thomas, citing Federal Rules of Evidence 1006, 403, and 702. As noted, Defendants must show an error and that it affected their "substantial rights," that is, "it affected the outcome of the trial court proceedings." *Alarcon*, 261 F.3d at 423. They have not.

1.      Rule 404(b)

Defendants say the Court improperly allowed the Government to introduce three categories of character evidence:

> 1) IRS civil record-keeping audits of return preparers at American Tax Service—a business not charged in the Indictment and which predated the charged crimes; 2) uncharged tax returns prepared by American Tax Service return preparers prior to

---

[3] When the Government rested, Randell appeared to join Earnest's constructive-amendment argument as it related to Count 8 against him, so the Court requested briefing by the end of the day. He did not submit a brief and appeared to abandon the issue the following morning. Though abandoned, the Court still explored the matter with the Government but ultimately agreed with the Government that not even Randell was claiming prejudice. He understood the charges he faced. Randell did not revisit this issue in his post-trial brief but, even if he had, the Court would deny the motion for the same reasons stated in the Court's ruling included in the record as C-7.

the charged conspiracy at Sunbelt Tax Service; and 3) other uncharged tax returns at Sunbelt Tax Service.

Earnest Mot. [238] at 6.

Rule 404(b)(1) precludes evidence of other wrongs or bad acts when used to prove a person's character and that he or she "acted in accordance with the character."  But Rule 404(b)(2) offers an exception.  That subpart allows evidence of other wrongs or bad acts when offered "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 402(b)(2).

These rules apply to evidence extrinsic to the charged offense; intrinsic evidence does not fall under Rule 404(b).  *United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006).  Evidence is "'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or other acts were necessary preliminaries to the crime charged."  *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (quoting *United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982)).  Finally, even if the evidence is intrinsic, or can be admitted under Rule 404(b)(2), the Court must still consider Rule 403.  *See generally United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). That rule allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

These issues were presented before trial, and the Court proceeded with caution, initially deferring, and then holding an evidentiary hearing.  *See* Order [183].  Even after that hearing, the Court limited its holding to the tax returns the Government used as examples during the hearing. Once the trial began, the Court continued to consider whether the evidence should be admitted

19

and augmented its previous rulings from the bench.  Nothing has changed that would bolster Defendants' arguments, and the Court incorporates those earlier holdings here.

Starting with the "uncharged" returns at Sunbelt, Earnest Mot. [238] at 6, the jury did hear about thousands of returns that were not charged under § 7206(2), mostly through Thomas's spreadsheet and summary chart.  *See* G-605.  But Count 1 charged Defendants with conspiring to defraud the United States from "on or about January 2, 2015" through "the date of this indictment"—in other words, the years that Sunbelt was open.  Indictment [3] at 1.  The false returns filed by Sunbelt are intrinsic to Count 1.  Even if not, they satisfy Rule 404(b)(2) and would not violate Rule 403 because they show a pattern that demonstrates the existence of the agreement and Defendants' willfulness.

The American Tax evidence was perhaps extrinsic but still admissible.  Starting with the audits, that evidence fell within Rule 404(b)(2) because the Government was required to prove willfulness.  The audit evidence established that Earnest and Randell knew they could not engage in the very practices for which they were later charged and spoke to their knowledge, intent, lack of accident, and plan.  *See* Fed. R. Evid. 404(b)(2); *see also United States v. Grimes*, 244 F.3d 375, 384 & n.18 (5th Cir. 2001).  The evidence also completed the story about why Earnest tried to conceal the fraud and protect himself after the audits—like using his employees' PTINs.

Earnest nevertheless argues that this case is like *United States v. Williams*, where the Fifth Circuit affirmed the district court's decision to exclude the defendant's tax history.  30 F.4th 263, 267 (5th Cir. 2022).  Although the Court noted that "Williams's tax history may well have permissible uses under Rule 404(b), like proving his willful intent or knowledge of tax obligations," it found no error in excluding the evidence under Rule 403 because "[p]aying taxes late is not the same as lying on tax forms."  *Id.* at 267–68.  According to Earnest, the civil audits

at American Tax are likewise distinguishable from the charges against him "because failing to keep adequate records is not the same as preparing fraudulent tax returns."  Earnest Mot. [238] at 9.  But that is not what the audit evidence shows.  While Earnest and Randell were audited for their record-keeping issues, the audits focused on the lack of records supporting their clients' Schedule As, Schedule Cs, and education credits.  And the auditors testified that through the course of the audits, Defendants understood the requirements for properly completing those schedules and claiming those credits.  The evidence shows notice, intent, and plan.

Similarly, Earnest says the Government should have limited its proof of the audits to a single agent and that it should not have been allowed to introduce the fine amounts.  Assuming Defendants made that objection at trial, there was more than one audit and more than one IRS witness with distinct relevant knowledge of those audits.  As for the fines, their size speaks directly to Defendants' willfulness.

Turning to the returns prepared at American Tax, they demonstrated that Earnest and Randell had a pattern of fraud that they carried over to Sunbelt.  The evidence again speaks to their intent, the lack of mistake, and their plan.  This evidence also included testimony from taxpayers who followed Defendants from American Tax to Sunbelt because of the large refunds they were receiving.  The evidence speaks to that but also to their familiarity with Defendants, whom they identified in Court.   And the fact that these same patterns followed the individual taxpayers from American Tax to Sunbelt is again probative of Rule 404(b)(2) issues.

Defendants also claim that the considerable evidence of "uncharged" returns caused confusion and prejudice.  Again, the returns from Sunbelt were not "uncharged."  And the returns from American Tax would not cause "unfair prejudice" or confusion.  Fed. R. Evid. 403.

As noted, the extrinsic evidence related to events at American Tax; the charges in the indictment related to acts at Sunbelt.  That gave the jury an easy demarcation.

Even if there was some confusion, it did not substantially outweigh the probative value; indeed, the volume of other-acts evidence became more probative as the trial progressed. Defendants suggested to the jury that the false returns could have resulted from confusion or mistake.  For example, during his opening statement, Earnest's counsel told the jury that preparing tax returns is complicated and nuanced—suggesting that his client lacked the intent to defraud.  That theory continued with the cross-examination of IRS Agent Sam Thomas, who was asked to confirm that the number of suspicious returns was just a percentage of all returns Sunbelt prepared.  Cella was likewise asked to confirm that Sunbelt prepared legitimate returns. Those arguments make the volume of other unsupported filings even more probative to show that this was no mistake.  Similarly, the fact that Defendants and those they trained or worked with were all doing the same thing—over and over—is highly probative of the existence of an agreement.  Yes, there was a lot of evidence.  But the volume itself was probative, and it was not substantially outweighed by the risk of unfair prejudice or confusion.

The Court also reduced the risk of confusion and unfair prejudice by repeatedly instructing the jury about the proper use of the extrinsic, other-acts evidence during trial. Defendants were concerned that the jury might view the audit evidence as proof that the returns from American Tax were themselves fraudulent rather than as proof of notice.  The Court told the jury that the "evidence is not being offered and should not be considered by you as proving whether or not those returns were accurate.  The evidence is being offered by the government in hopes of proving that [Defendant] was on notice of certain requirements."  The Court then gave a standard Rule 404(b) special instruction when other evidence was offered.

The final instructions made things even more clear, explaining the proper use of other-acts evidence and stating: "There are no crimes charged in this case related to any returns prepared at American Tax Services. So, you must not consider any of this evidence in deciding if these Defendants committed the acts charged in the indictment related to Sunbelt." C-9 at 11. The Court then explained the proper uses for the American Tax evidence, like proving notice or absence of mistake. *Id.* That instruction also told the jury that the American Tax evidence involved Earnest and Randell—not Klish—which addressed Klish's concern that he was tainted by it. The Court may "safely assume 'the almost invariable assumption . . . that [the] jurors follow[ed] their instructions.'" *United States v. Shah*, 84 F.4th 190, 232 (5th Cir. 2023) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).

Finally, even assuming error about other-acts evidence, that error would be harmless. Client after client and return after return demonstrated the same pattern of fraud at Sunbelt. As the clients testified, Defendants were simply making up numbers on Schedule As and Schedule Cs while also claiming unwarranted education credits. The practice was even caught on camera. Any error was harmless.

2.      Objections to G-605 offered through Sam Thomas

As noted above, Thomas mined the IRS's database for examples of Sunbelt-prepared tax returns that claimed education credits but for which there were no corresponding 1098Ts; there were 4,509 matches. He printed those results in a 117-page spreadsheet and prepared a one-page summary of the data, collectively introduced as G-605.

Earnest opposed this evidence in a mid-trial motion in limine [215] that the Court denied after conducting a hearing. He now renews that objection, summarizing that "the government was . . . permitted to introduce a highly prejudicial summary chart through Investigative Analyst

Sam Thomas that was inadmissible under Rules 1006, 403, 702 and *Daubert*."  Earnest Mot.
[238] at 10.

Earnest first says "G-605 was admitted as a summary of 4509 tax returns titled 'Summary
of Tax Returns Filed Claiming Education Credits with No Supporting 1098T.'"  *Id.*  He argues
that the spreadsheet was "not a proper summary exhibit under Rule 1006 because the underlying
tax returns purportedly summarized were not made available to the defendant or the jury."  *Id.*
But that's not what the Court held.  The Court concluded that the spreadsheet constituted the
original document under Rule 1001(d) and the one-page summary fell under Rule 1006.

"Federal Rule of Evidence 1001(d) defines an 'original' of electronically stored
information as 'any printout—or other output readable by sight—if it accurately reflects the
information.'"  *United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018) (quoting Fed. R.
Evid. 1001(d)).  Rule 1006 allows a proponent to

> use a summary . . . to prove the content of voluminous . . . recordings . . . that
> cannot be conveniently examined in court.  The proponent must make the
> originals or duplicates available for examination or copying, or both, by other
> parties at a reasonable time and place.

So, if the party offering the spreadsheet can lay a proper foundation for it, the spreadsheet itself
would be considered an original.  *Channon*, 881 F.3d at 810.  As a result, there would be no duty
under Rule 1006 to produce the database if the party lays the proper foundation and produces the
spreadsheet from which the summary was prepared.  *Id.*; *cf. United States v. Valencia*, 600 F.3d
389, 417–18 (5th Cir. 2010) (holding database need not be admitted when summary of its
contents is offered).  Earnest did not address these holdings in his post-trial motion.

Earnest next argues that Thomas gave impermissible expert testimony, but he waived that
objection at trial.  In his motion in limine [215], Earnest made the same Rule 702 arguments he
now asserts.  But when he argued that motion at trial, the Court observed that Thomas's

24

testimony would not violate Rule 702 if he merely added the number of hits.  Earnest's counsel appeared to agree so long as the Government did not solicit additional opinions, and he made no Rule 702 objections during Thomas's testimony.  The objection is waived under Federal Rule of Civil Procedure 103(a).  Earnest has not shown plain error.

Earnest's last argument about Thomas is linked to his Rule 702 argument.  According to him, it caused unfair prejudice to allow the jury to hear Thomas's expert testimony about the reliability of his spreadsheet when only ten taxpayers testified.  Earnest Mot. [238] at 10–11.  He claims that this is an insufficient sample size and notes that "expert evidence can be both powerful and quite misleading."  *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).  He made his Rule 403/Rule 702 argument about the sample size in his trial brief, but he then waived the Rule 702 issue on the record and never asserted a stand-alone Rule 403 objection during Thomas's testimony.  So, if he is now challenging Thomas's methodology under Rule 403, he waived that objection at trial and has not shown prejudicial error given the overwhelming evidence of guilt.

The other Rule 403 argument Earnest made during trial was linked to Rule 404(b).  When Earnest moved in limine, the Government was offering a different version of G-605 that included similar results from American Tax.  Earnest argued that it would violate Rules 404(b)(1) and 403.  *See* Earnest Mot. [215] at 4.  But the Government stripped the other-acts evidence from G-605, leaving only returns at Sunbelt.  Thus, that Rule 403 argument became moot by the time the parties argued the motion at trial, and Earnest made no Rule 403 arguments other than the Rule 702 argument mentioned above.

Assuming he can now argue Rule 403, he has not shown unfair prejudice that substantially outweighs probative value or that his substantial rights were violated.  He does say

25

there could be prejudice because he is not linked to every return on Thomas's summary.  Even so, the evidence is probative of the conspiracy conviction.  He also contends that the jury may have believed that all 4,509 returns contained false claims even though only ten taxpayers confirmed issues with theirs.  That's true, but the lack of documentation for these credits remains probative of a pattern of claiming unwarranted education credits.  And Earnest cites no authority suggesting that the Government was required to call the taxpayers associated with the over 4,000 returns that lacked proper documentation.

In any event, any error would not be prejudicial because there was other evidence that Sunbelt employees routinely claimed false education credits:  (1) taxpayers testified that they received the credits despite not attending school; (2) Wells and Cella testified that manipulating education credits was standard practice; (3) witnesses (including two from local schools) testified that the 1098Ts were mandatory; and (4) Klish's and Randell's own returns (one of which Earnest prepared) claimed education credits for attending schools with no record of their attendance.  In short, the evidence was overwhelming, and any error would be harmless.

IV.    Conclusion

The Court has considered all arguments.  Those not directly addressed would not change the outcome.  For the reasons stated, Defendants' motions [238, 239, 240] are denied.

**SO ORDERED AND ADJUDGED** this the 18th day of January, 2024.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE